**John J. CANARIO, et al., Plaintiffs,**

v.

**BYRNES EXPRESS & TRUCKING CO., INC., and Albert J. Byrnes, individually and as President of Byrnes Express & Trucking Co., Inc., Defendants.**

**No. CV 85–4209.**

United States District Court, E.D. New York.

Sept. 16, 1986.

---

O'Connor & Mangan, Long Island City, N.Y., for plaintiffs.

Matthew J. Vetri, Brooklyn, N.Y., for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiff trustees[1] commenced this action pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 ("ERISA"), as amended by the Mul-

---

1. The plaintiffs in this action are John J. Canario, Vincent Connell, Fred Acquavita, Morton Schimmel, Frank Scotto, and Benjamin Young, as Trustees of the Local 816 Labor and Management Pension Trust Fund.

tiemployer Pension Plan Amendments of 1980, Pub.L. 96–364, 94 Stat. 1296 (1980) ("MPPAA"), against defendants Byrnes Express & Trucking Co., Inc. ("Express" or the "Company") and Albert J. Byrnes to collect withdrawal liability under ERISA. Plaintiffs have moved for summary judgment against both defendants, who have cross-moved for partial summary judgment in favor of Byrnes.

## I.

Defendant Express was a trucking concern. Express occupied leased space in New Jersey and a facility in Brooklyn that Byrnes leased rent-free to Express. Since 1974 when Byrnes obtained the business from his mother, he was Express's President, sole shareholder, and its only management employee. Byrnes drew only a salary, took no other money from Express, and did not comingle his funds with those of the Company. Due to declining economic fortunes, Express had shown losses for several years and Byrnes loaned thousands of dollars to the Company in order to make up the deficit and avert bankruptcy. Byrnes cut back operations in an effort to keep the Company in business but Express continued to operate at a loss. Consequently, Byrnes acted to liquidate Express's assets and dissolve the Company, a process that was completed in early 1984. Express has no debts other than those arising from this lawsuit.

At the time of Express's demise, it was a party to a collective bargaining agreement with Local 816, an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehouseman and Helpers of America. The agreement, which had been signed by Byrnes as President of Express, required the Company to make monthly contributions to Local 816's pension trust fund. Express made contributions to the trust fund until April 30, 1984, when the company finally ceased operations and was no longer obligated to make contributions.

On March 8, 1985, over a year after Byrnes dissolved Express, Joseph Matranga, Local 816's Pension Fund Manager, sent a letter to Byrnes notifying him that, as a consequence of the cessation of operations, Express had a withdrawal liability to Local 816 of $26,800.[2] Matranga also informed Byrnes that in light of Express's financial condition, Local 816's Trustees had concluded that Express was in default of its obligation pursuant to 29 U.S.C. § 1399(c)(5)(B), and the full amount was due April 1, 1985. Failure to comply would result in the commencement of a lawsuit but, pursuant to 29 U.S.C. § 1399(b)(2)(A), Express would have ninety days to seek a review of the Trustees' decision. Express neither tendered any money nor requested a review of the decision. On April 15, 1985 and again on June 15, Matranga subsequently notified Express of its delinquency, but no payments were made and Express made no attempt to either review the Trustee's decision under 29 U.S.C. § 1399(b)(2)(A) or pursue arbitration. 29 U.S.C. § 1401. This lawsuit ensued.

## II.

As enacted, ERISA is divided into three subchapters, the largest of which, Subchapter III, 29 U.S.C. §§ 1301–1461, concerns plan termination insurance. Subtitle E of Subchapter III, 29 U.S.C. §§ 1381–1426, is devoted specifically to multiemployer pension plans, and the first part of Subtitle E contains provisions relating to employer withdrawals.

Not long after the passage of ERISA, Congress became concerned that the accumulated pension funds would be inadequate to satisfy vested benefits, forcing the government-owned Pension Benefits Guaranty Corporation ("PBGC") to assume any

---

**2.** Byrnes has long been aware that Express faced withdrawal liability. The Court takes judicial notice of a prior lawsuit commenced by the same plaintiffs against Express, *Canario v. Byrnes Express & Trucking Co., Inc.*, CV 84–3933 (E.D.N.Y. discontinued by stipulation on February 15, 1985 prior to the entry of a default judgment). In that case, plaintiffs also sought to collect withdrawal liability from Express after defendant corporation allegedly failed to make the required payments.

excess liability. In an effort to shore-up the pension system, Congress amended ERISA in 1980 through the enactment of the MPPAA. In *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Supreme Court outlined the history and purposes of the 1980 amendments to ERISA. "As enacted, the MPPAA requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan. This withdrawal liability is the employer's proportionate share of the plan's 'unfounded vested benefits,' calculated as the difference between the present value of the vested benefits and the plan's assets." *Id.* § 1391(a) places the burden on the plan sponsor to determine the extent of the employer's withdrawal liability, and § 1391(b) sets forth an evaluation sequence for determining the withdrawal liability. Using a statutory formula, the plan sponsor must look to § 1391(b), (c), or (d) to compute an employer's withdrawal liability. Once a figure has been arrived at, § 1381(b)(1) then directs that this figure is to be adjusted by the sequential application of other sections of the statute, each of which have the effect of limiting an employer's withdrawal liability. The plan sponsor also has the burden of notifying the employer and demanding payment. 29 U.S.C. § 1391(b)(1). The employer may seek an informal review of the plan sponsor's decision on withdrawal liability, but must do so within ninety (90) days after receipt of notice. § 1399(b)(2)(A). The plan sponsor must respond to the employer's request for review within a reasonable time.

§ 1399(b)(2)(B). Any dispute between the employer and the plan sponsor concerning the existence or extent of withdrawal liability must be arbitrated before it can be litigated in federal court. § 1401(a)(1).

## A. EXPRESS

In this case plaintiffs contend that the fact and amount of Express's withdrawal liability has already been determined by Local 816 and, by failing to request a review or seek arbitration, Express has waived its right to contest that determination in this Court. Defendants concede that Express did not request a review of Local 816's decision within ninety days of March 8, 1985 and never made a request for arbitration.[4] Nevertheless, they maintain that Express is permitted to contest the amount of its withdrawal liability here because, in the case of an insolvent employer, there is no explicit statutory requirement that the employer contest the withdrawal liability decision through arbitration before proceeding in federal court. Defendants buttress this contention by arguing that the clear language of ERISA and the policies favoring arbitration allow Express to bypass the statutory procedures for review and arbitration and present its claim under § 1405 for the first time in this Court. Plaintiffs' rejoinder is that this position is contrary to both the policies underlying the requirement of arbitration and settled precedent.

The Court turns first to the statute. § 1401 requires arbitration for "[a]ny dis-

---

**3.** § 1381(b)(1) states that:
(b) For purposes of subsection (a) of this section—
(1) The withdrawal liability of an employer to a plan is the amount determined under section 1391 of this title to be the allocable amount of unfunded vested benefits, adjusted—
(A) first, by any de minimis reduction applicable under section 1389 of this title,
(B) next, in the case of a partial withdrawal, in accordance with section 1386 of this title,
(C) then, to the extent necessary to reflect the limitation on annual payments under section 1399(c)(1)(B) of this title, and

(D) finally, in accordance with section 1405 of this title.

**4.** The instant case is therefore unlike *Jaspan, et al v. Certified Industries, Inc.*, 645 F.Supp. 998 (E.D.N.Y.1985) (Mishler, J.) where the defendant disputed its withdrawal liability under § 1384. There the Court held that if the defendant did not arbitrate its dispute, it could not litigate in federal court because the statutory language in § 1401(a) explicitly requires that withdrawal liability must be arbitrated. *Jaspan*, 645 F.Supp. at 1005–06.

pute between an employer and a plan sponsor ... concerning a determination made under sections 1381 through 1399 of this title...." 29 U.S.C. § 1401(a)(1).[5] § 1405(b), the section of ERISA that limits withdrawal liability for insolvent employers, is not within §§ 1381–99.[6] Although it appears that arbitration is not mandatory for determinations made under § 1405(b), there are other indications from that statute that Congress intended arbitration for § 1405. First, § 1381(b)(1)(D) requires plan sponsors to consider § 1405 when adjusting withdrawal liability. Therefore, it seems clear that any decision of a plan sponsor under § 1381, and any subsequent arbitration, would have considered an employer's insolvency under § 1405. Second, after a matter has gone to arbitration, the procedures under § 1401(a)(3)(A) contemplate that the arbitrator will evaluate issues of insolvency under § 1405.[7] Therefore, despite the absence of any specific statutory language requiring arbitration for § 1405, the numerous cross-references in the statute make evident that issues of insolvency under § 1405 are part of the calculus for determining withdrawal liability under § 1381 and § 1391 and, therefore, should be a subject for informal review under § 1399 and arbitration under § 1401.

■ Furthermore, Express's interpretation of the statutory scheme would result in cumbersome and unnecessarily protracted litigation. If, as defendants contend, an employer is not required to litigate insolvency in arbitration and could defer presenting any defense under § 1405 until the federal court proceeding was commenced, there would be no incentive to arbitrate withdrawal liability fully because any decision in arbitration would be incomplete until the court had resolved any § 1405 issues. The consequence of this interpretation is piecemeal adjudication; an arbitration hearing would both precede and follow the decision of the district court, with either party able to return to the court for a second time after the final decision of the arbitrator has been issued. It is more likely that Congress intended for an employer to present, in the arbitration context, and before proceeding to court, all claims or defenses relating to the fact and extent of withdrawal liability. *Trustees of the Amalgamated Cotton Garment and Allied Industries Fund v. Baltimore Sportswear, Inc.,* 632 F.Supp. 641, 642 (S.D.N.Y.1986). The case of *Trustees of the Amalgamated Insurance Fund v. Geltman Industries, Inc.,* 784 F.2d 926 (9th Cir.1986) is an example of how the Court envisions the functioning of the adjudicatory process.

■ The policies underlying arbitration also support this conclusion. Arbitration fulfills Congress's express preference for dispute resolution in a non-judicial forum, utilizes the arbitrator's skill and expertise

5. § 1401(a)(1) states that:

(1) Any dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under section 1381 through 1399 of this title shall be resolved through arbitration.

6. § 1405(b) states that:

(b) Unfunded vested allocable to involent employer undergoing liquidation or dissolution; maximum amount; determinative factors.

In the case of an insolvent employer undergoing liquidation or dissolution, the unfunded vested benefits allocable to that employer shall not exceed an amount equal to the sum of—

(1) 50 percent of the unfunded vested benefits allocable to the employer (determined without regard to this section), and

(2) that portion of 50 percent of the unfunded vested benefits allocable to the employer (as determined under paragraph (1)) which does not exceed the liquidation or dissolution value of the employer determined—

(A) as of the commencement of liquidation or dissolution, and

(B) after reducing the liquidation value of the employer by the amount determined under paragraph (1).

7. § 1401(a)(3)(A) states that:

(A) For the purposes of any proceeding under this section, any determination made by a plan sponsor under sections 1381 through 1399 of this title and section 1405 of this title is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous.

with matters unfamiliar to the courts, and promotes judicial economy. *I.A.M. National Pension Fund Benefit Plan C v. Stockton Tri Industries,* 727 F.2d 1204, 1208 (D.C.D.C.1984); *Republic Industries v. Central Pennsylvania Teamsters Pension Fund,* 693 F.2d 290, 294 (3d Cir.1982). Courts have held that arbitration is not a jurisdictional prerequisite to a suit under MPPAA, *Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund of Philadelphia and Vicinity,* 787 F.2d 897 (3d Cir.1986); *Stockton Tri Industries,* 727 F.2d 1204; but these are rare cases and, for a court to bypass arbitration there must be a constitutional question, an issue of statutory construction, or no need to develop a factual record. *IUE AFL–CIO Pension Fund v. Barker & Williamson,* 788 F.2d 118, 128–29 (3d Cir.1986); *Dorn's Transportation,* 787 F.2d at 903.

▮ The facts of the instant case do not justify allowing Express to raise a § 1405 issue for the first time in this forum. Express argues that the issue of whether or not it is insolvent under § 1405(d) is an issue of statutory construction requiring the expertise of this Court. We disagree. Insolvency is defined in the statute.[8] Establishing insolvency under § 1405(d) does not require statutory interpretation or other skills beyond an arbitrator's expertise or jurisdiction. Moreover, there has not yet been a determination as to whether Express is insolvent. The need to develop the record on this issue places the matter squarely within the province of the arbitrator. In addition, the arbitrator is better equipped to apply the complex statutory formulae under § 1391 and § 1405(b). Arbitration might not necessarily have been the best forum in which to litigate § 1405 issues. Defendants could have availed themselves of other procedures to contest withdrawal liability. *E.g., Barker & Williamson,* 788 F.2d at 128. But from the time that Matranga informed Express on March 8, 1985 that there was withdrawal liability, until the commencement of this lawsuit, Express did nothing. It did not seek an informal review, request arbitration, or commence an action in this Court. It should not be rewarded for its inaction. *Id.*

Therefore, the Court concludes the withdrawal liability of Express has been established at $26,800 and by failing to seek a review under ERISA, 29 U.S.C. § 1399, 1401, Express waived its right to contest liability in this Court. Plaintiffs are therefore entitled to summary judgment against Express.

### B. BYRNES

Plaintiffs also seek summary judgment against Byrnes as the President and sole owner for the withdrawal liability of his corporation. Plaintiffs' argument is twofold. Plaintiffs argue first that under the "economic reality" theory espoused in *Donovan v. Agnew,* 712 F.2d 1509 (1st Cir. 1983), the broad definition of "employer" under the Fair Labor Standards Act, 29 U.S.C. § 203(d) ("FLSA"), should be applied to ERISA because the two statutes evince a similar Congressional purpose and seek to advance congruent policies. An application of the economic reality test to this case, plaintiffs suggest, will show conclusively that Byrnes was the employer because, among other things, he was Express's President, sole shareholder, lone management employee, and acted for the company in every aspect of its affairs. Plaintiffs argue second that Byrnes falls within ERISA's definition of employer. 29 U.S.C. § 1002(5). Therefore, under either

---

**8.** § 1405(d) states that:

(d) Insolvency of employer; liquidation or dissolution value of employer

For purposes of this section—

(1) an employer is insolvent if the liabilities of the employer, including withdrawal liability under the plan (determined without regard to subsection (b) of this section), exceed the assets of the employer (determined as of the commencement of the liquidation or dissolution), and

(2) the liquidation or dissolution value of the employer shall be determined without regard to such withdrawal liability.

Once the arbitrator has determined a corporation's assets and liabilities, it is a matter of simple arithmetic to conclude whether a corporation is insolvent under § 1405(d).

theory, plaintiffs maintain that Byrnes should be personally responsible for the withdrawal liability of Express.

Despite plaintiffs' arguments, the Court is persuaded by the cases that hold corporate officers and stockholders immune from a corporate employer's withdrawal liability. *See Solomon v. Klein,* 770 F.2d 352 (3d Cir.1985); *Connors v. B.M.C. Coal Company,* 634 F.Supp. 74 (D.D.C.1986); *Combs v. Sun-Up Coal Co.,* 634 F.Supp. 13 (D.D.C.1985); *Connors v. Darryll Waggle Construction, Inc.,* 631 F.Supp. 1188 (D.D.C.1986); *Combs v. Indyk,* 554 F.Supp. 573 (W.D.Pa.1982). *See also Operating Engineers Pension Trust v. Reed,* 726 F.2d 513 (9th Cir.1984) (individual corporate officer generally not liable for corporate pension fund obligations); *Refined Sugars, Inc. v. Local 807 Labor-Management Pension Fund,* 632 F.Supp. 630 (S.D.N.Y.1986). Plaintiffs' reliance on *Connors v. Calvert Development Co.,* 622 F.Supp. 877, (D.D.C. 1985); *PBGC v. Ouimet Corp.,* 630 F.2d 4 (1st Cir.1980); *Central Pennsylvania Teamster's Pension Fund v. Service Group, Inc.,* 645 F.Supp. 996, 6 EBC 1491 (BNA) (E.D.Pa.1985); and *Local 807 Labor-Management Pension Fund v. ABC Fast Freight Forwarding Corp.,* 82 CV 3356 (E.D.N.Y. March 1, 1984) is misplaced because these cases do not involve closely related corporate entities or a common control group. 29 U.S.C. § 1301(b)(1). Express, which was a party to the collective bargaining agreement was owned wholly by Byrnes, and, was neither linked to nor controlled by any other corporation. Insofar as there is no dispute that Express was Byrnes's alter ego or that he defrauded Local 816 through the corporate entity, this Court is limited to the question of whether Congress intended to hold corporate officers liable for the corporation's MPPAA withdrawal liability. We conclude that it did not.

The Court is aware that there are a line of cases originating primarily from the District of Massachusetts that would hold a corporate officer or shareholder liable for the debts of the corporation.[9] Nevertheless, this Court is persuaded, largely for the reasons stated in *Combs v. Sun-Up Coal Co., Inc.,* 634 F.Supp. 13, that Byrnes should not be liable here. Unlike *Solomon, Sun-Up Coal, B.M.C. Coal,* and the other cases cited above, the lead case favoring liability, *Massachusetts State Carpenters Pension Fund v. Atlantic Diving Company,* 635 F.Supp. 9 (D.Mass. 1984), was a contributions case and does not involve withdrawal liability. As Judge Greene noted in *Sun-Up Coal,* it may be incorrect to apply the "economic reality" doctrine of the FLSA to Title IV of ERISA because withdrawal liability usually involves circumstances quite removed from a failure to pay contributions. 634 F.Supp. at 16. Second, there are strong textual arguments that the definition of employer under Title I of ERISA, 29 U.S.C. § 1002(5), should not be extended to withdrawal liability under Title IV. 634 F.Supp. at 16–17. Although "employer" is not re-defined under Title IV, the Supreme Court has held that the definitions under Title I are "not necessarily applicable to Title IV because they are limited by the introductory phrase, 'For the purposes of this title.'" *Nachman Corp. v. PBGC,* 446 U.S. 359, 370, 100 S.Ct. 1723, 1731, 64 L.Ed.2d 354 (1980). A court must examine the legislative history to determine if the term employer, as used in Title I, was meant to apply to Title IV. A close reading of the statute and the legislative history does not indicate any intent by Congress to abrogate the normal state law immunity of corporate officers or shareholders from corporate liability. *See Connors v. Darryl*

---

9. *United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry, Local 276 v. Babbit & Simmons,* No. 84–1537 (D.Mass. May 8, 1986) (Collings, Mag.) [Available on WESTLAW, DCTU database]; *Debreceni v. Graf Brothers Leasing, Inc.,* No. 85–3366 (D.Mass. Apr. 2, 1986) (Mazzone, J.); *Rubenstein*

*v. Tri-State Transport,* 646 F.Supp. 1, 6 EBC 2372 (BNA) (D.Mass.1984) (Skinner, J.); *Massachusetts State Carpenters Pension v. Atlantic Diving Co., Inc.,* 635 F.Supp. 9 (D.Mass.1984) (Mazzone, J.); *Alman v. Servall Mfg.,* 6 EBC 2031 (BNA) (D.Mass. Apr. 9, 1984) (Mazzone, J.).

*Waggle Construction*, 631 F.Supp. at 1191 (citing 1980 U.S.Code Cong. & Ad.News 2918, 2924). Because plaintiffs have not sought to pierce the corporate veil, the Court concludes that Byrnes is not liable for the withdrawal liability of Express.

### III.

Plaintiffs' motion for summary judgment against defendant Express is granted. Plaintiffs' motion for summary judgment against defendant Byrnes is denied. The motion of defendant Byrnes for summary judgment is granted and the Complaint is dismissed as against him. The Clerk of the Court is directed to enter judgment on behalf of Byrnes.

The Clerk of the Court shall not enter judgment against Express at this time. Plaintiffs are directed to submit to the Court and to opposing counsel within ten (10) days a proposed form of judgment containing: (1) the amount of Express's withdrawal liability; (2) the amount of interest due; and (3) any liquidated damages. No attorneys fees. Each side to bear its own costs.

SO ORDERED.